Big "D" Development Corporation v. Commissioner.
Big "D" Development Corp. v. Commissioner
Docket No. 4758-68.
United States Tax Court
T.C. Memo 1971-148; 1971 Tax Ct. Memo LEXIS 183; 30 T.C.M. (CCH) 646; T.C.M. (RIA) 71148; June 21, 1971, Filed Fritz Lyne, 1400 Adolphus Tower, Dallas, Tex., and Ira Lee Allen, for the petitioner Richard K. Seltzer, for the respondent. STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: Respondent determined a deficiency of $143,701.35 in petitioner's income tax for the fiscal year ending October 31, 1964. The question before the Court is whether a sale of land by petitioner in 1964 qualifies for installment method of reporting income under section 453(b). [1]
Findings of Fact All of the facts were stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference. The Big "D" Corporation (hereinafter referred to as petitioner) *184 is a Texas corporation presently having its principal place of business in Houston, Texas. At the time of filing its petition herein, petitioner's principal place of business was located in Dallas, Texas. Petitioner was incorporated in 1955 and has kept its books and reported its income on a cash basis, utilizing a fiscal year ended October 31. Petitioner timely filed its Federal corporation income tax return for the 1964 fiscal year with the district director of internal revenue, Dallas, Texas. During 1964, petitioner's president was D. A. Childre who, together with his brother H. Thad Childre, owned sufficient units of a voting trust so as to control the election of petitioner's directors. Also D. A. Childre owned 24.5 percent and H. Thad Childre owned 34.6 percent of petitioner's stock in 1964. Petitioner, in turn, controlled a voting trust and owned sufficient shares of common stock in Great Southwest Life Insurance Company (hereinafter referred to as Great Southwest), also a Texas corporation, to give it voting control of Great Southwest. During times relevant hereto, all, or almost all, of petitioner's directors and shareholders were directors of Great Southwest. H. Thad *185 Childre was chairman of the board and C. A. Childre was president of Great Southwest during 1964. Prior to 1964 petitioner had acquired land along the North Central Expressway near its intersection with Blackburn and Haskell Streets in the city of Dallas. The property was referred to as the Block 4/975 land, and had an adjusted tax basis to petitioner of $414,631.02 on October 23, 1964. By general warranty deed dated October 23, 1964, and delivered at a closing on October 29, 1964, petitioner conveyed the Block 4/975 land to Great Southwest for a total price of $967,518 resulting in a net long term capital gain to petitioner of $552,886.98. The transaction was approved in a corporate resolution, dated October 29, 1964, passed by the board of directors of petitioner and in a corporate resolution, also dated October 29, 1964, passed by the board of directors of Great Southwest at their respective meetings held on that day. By 647 those resolutions, each board of directors agreed that the total value of the Block 4/975 land was $967,518, based upon an appraisal, and that the effective date of the sale was October 23, 1964. Great Southwest purchased the Block 4/975 land subject *186 to a first lien note the principal amount of which on October 1, 1964, was $374,213.95 and upon which, as of October 23, 1964, there was accrued interest in the amount of $1,434.51. A check for $3,145.15 was issued by Great Southwest to Southwest Title and Abstract Company in payment of the full amount of the closing costs. In exchange for the Block 4/975 land, Great Southwest executed a bond payable to the petitioner and dated October 23, 1964. The bond (hereinafter referred to as the Great Southwest bond) was in the face amount of $591,175.55 which was determined by subtracting from the agreed purchase price of $967,518, the closing costs paid by Great Southwest and chargeable to the petitioner in the amount of $2,128.50, and the first lien on the property in the amount of $374,213.95. The terms of the Great Southwest bond provided it was payable on or before 5 years from its effective date, and that it would bear interest at the rate of 5 1/2 percent per year. Amounts not exceeding a total of $150,000, out of specified percentages of premium income from various types of policies written by Great Southwest were to be placed in a sinking fund. Principal and interest were to be paid *187 from the sinking fund. However no payments were to be made into the sinking fund if the capital and unrestricted surplus of Great Southwest would thereby be reduced below $687,900. Neither the unpaid principal nor the interest due under the bond would be a liability of Great Southwest or a claim against any of its assets except the sinking fund. Finally the bond retained for Great Southwest the right at its option, to make a payment of all or any part of the principal or interest at any time out of any funds of the company without penalty or loss rights under the bond. The Great Southwest bond was non-negotiable, completely conditional and practically worthless. The total capital and surplus amount fixed under the Great Southwest bond was subject to adjustment in case of merger of Great Southwest. Effective December 31, 1964, Great Southwest and Texas Reserve Life Insurance Company merged and Great Southwest was the surviving corporation. In accord with the terms of the bond, the minimum total capital and surplus amount fixed under the bond before payments could be made into the sinking fund was adjusted upward from $687,900.00 to $1,497,699.33. At no time during the periods ended *188 December 31, 1964, through December 31, 1968, was the combined capital and surplus of Great Southwest as much as $1,497,699.33. At the conclusion of its fiscal year ending September 30, 1964, Great Southwest held a general obligation bond of the petitioner (hereinafter referred to as the Big "D" bond). The Big "D" bond was in the principal amount of $700,000 all of which was outstanding on September 30, 1964. The bond was due June 1, 1969, and it provided for interest at the rate of 5 1/2 percent per year. Payment of the Great Southwest bond was effected by entries on the books of petitioner reducing the principal and interest owing on the Big "D" bond held by Great Southwest as follows: Date
Total Payment
Interest
Principal
June 1, 1965
$ 89,416.58
$ 8,908.12
$ 80,508.46
June 1, 1966
91,951.73
38,776.44
53,175.29
June 1, 1967
38,500.00
25,162.05
13,337.95
June 23, 1967
58,002.00
58,002.00
June 1, 1968
93,500.00
24,317.25
69,182.75
July 12, 1968 318,954.56
1,985.46
316,969.10 $690,324.87
$99,149.32
$591,175.55
In its Federal corporate income tax return for fiscal year ending October 31, 1964, petitioner made a timely *189 election to report the gain realized from the sale of the Block 4/975 property on the installment method. Respondent, in a statutory notice dated July 9, 1968, included the entire amount of the gain in petitioner's fiscal year 1964 income for the stated reason "* * * that this gain is not reportable using the installment method of reporting." 648 Opinion We are to determine whether the transfer on October 23, 1964, by petitioner, Big "D" Development Corporation, of real estate in Dallas, Texas, known as the Block 4/975 property, to the Great Southwest Life Insurance Company qualifies under section 453[2] for reporting under the installment method. Respondent contends that the entire gain realized on the transaction must be included in petitioner's income for its fiscal year ended October 31, 1964, because, it is alleged, petitioner transferred the land in return for immediate part cancellation of a substantial portion of its indebtedness to Great Southwest. *190 Prior to dealing with the issue thus framed, a preliminary matter must be disposed of. Petitioner in its reply brief contends that respondent in his opening statement before this Court and in his brief has raised a new issue which, not having been pleaded, cannot be entertained by this Court, or which, at least, shifts the burden of proof to the respondent. We cannot agree. Respondent in the statutory notice said: (b) It is determined that you realized additional income of $550,903.47 from the sale of Block 4/975 of Middleton Brothers Oak Grove Addition to the City of Dallas, Dallas County, Texas, computed as follows: * * * It is further determined that this gain is not reportable using the installment method of reporting. As can be seen the determination made by respondent is very broadly based. At the hearing where this case was submitted to the Court, respondent, in his opening statement, adduced several alternative theories supporting the determination in the statutory notice. In his opening brief respondent discarded all theories but the one set out above; that the transaction resulted in the immediate cancellation of a substantial indebtedness owing to the vendee, and *191 petitioner thus received all that was owing it under the agreement of sale. It is readily apparent that respondnet merely narrowed the issue after taking a broad position in the statutory notice. The specific reason for the purported deficiency, as finally asserted in respondent's opening brief and in his remarks before the Court, is consistent with and inherent in the determination set out in the notice of deficiency. Proceeding from the broad to the specific, as the respondent has in this case, does not destroy the presumptive correctness of the respondent's determination of deficiency and shift the burden of proof to the respondent, much less bar his contentions from consideration. Compare, C. D. Spangler, 32 T.C. 782, 793 (1959); and Raoul H. Fleischmann, 40 B.T.A. 672, 682 (1939) with Rozelle McSpadden, 50 T.C. 478, 493 (1968). It would be otherwise where respondent's determination in a statutory notice is narrowly drawn and, after the matter has been petitioned to this Court, respondent advances new grounds not directly or implicitly within the ambit of the determination made in the notice. Arthur Sorin, 29 T.C. 959, 969 (1958); *192 W. H. Weaver, 25 T.C. 1067, 1085 (1956). Since respondent has not raised a new issue, we hold the respondent's determination remains presumptively correct, and the burden of proof continues to be on petitioner. We now turn to the substantive issue of whether gain on the transaction in question can be reported by the installment method. The installment method of reporting provided by section 453(b) is a relief measure and an exception to the general rule requiring a cash basis taxpayer to report an item of income in the year received. This being so, the provision must be strictly construed. Cappel House Furnishing Co. v. United States, 244 F. 2d 525, 529 (C.A. 6, 1957), affirming, 140 F. Supp. 92 (S. D.Ohio, 1956). Substance and not form will determine whether a transaction is an installment sale, and an arrangement lacking reality will not be given effect. Griffiths v. Commissioner, 308 U.S. 355 (1939); Hindes v. United States, 326 F. 2d 150 (C.A. 5, 1964), reversing in part and affirming in part 214 F. Supp. 583 *193 (W.D. Tex., 1963), on remand 246 F. Supp. 147 (W.D. Tex., 1965), reversed in part and affirmed in part 371 F. 2d 650 (C.A. 5, 1967), Williams v. United States, 219 F. 2d 523, 527 (C.A. 5, 1955); Everett Pozzi, 49 T.C. 119, 127 (1967). On October 23, 1964, petitioner conveyed the Block 4/975 land to Great Southwest, and received in return the assumption of a first lien on the land in the amount of $374,213.95, payment of its $2,128.50 share of closing costs, and a bond in the face amount of $591,175.55. The total purchase price was $967,518. Petitioner had a basis of $414,631.02 in the property, and thus realized a gain of $552,886.98. The Great Southwest bond was specifically payable to petitioner, bore interest of 5 1/2 percent per annum, was non-negotiable, and was payable five years from its effective date of October 23, 1964. At the time of the conveyance, Great Southwest held a general obligation bond issued to it by the petitioner. The Big "D" bond was in the principal amount of $700,000, and nothing in the evidence indicates that any payments on the principal had been made prior to October 23, 1964. The due date for *194 the Big "D" bond was June 1, 1969, and interest was payable on the bond at the rate of 5 1/2 percent per year. The amounts due petitioner under the Great Southwest bond were satisfied by a series of entries on the books of petitioner from 1965 through 1968 whereby its obligation for principal and interest to Great Southwest under the Big "D" bond was reduced to zero. Petitioner had voting control of Great Southwest, and was in turn controlled by H. Thad Childre and D. A. Childre who were, respectively, chairman of the board and president of Great Southwest. Under the circumstances here present petitioner must show that the Big "D" bond was independent from the transaction conveying the Block 4/975 land. United States v. Williams, 395 F. 2d 508, 511 (C.A. 5, 1968); Blue Flame Gas Co., 54 T.C. 584, 595 (1970). Careful scrutiny of the transaction and the obligations petitioner and Great Southwest owed each other is required because of the close interrelationship of the two corporations. Petitioner was in control of Great Southwest. Under the terms of the bond it gave in return for the Block 4/975 property, Great Southwest could pay the entire amount due *195 at any time. Thus the inference can fairly be drawn that petitioner was in a position to effect an immediate $591,175.55 reduction of its $700,000 indebtedness to Great Southwest, and no evidence presently before this Court serves to negate this inference. Petitioner in its reply brief argues there is no evidence showing that the Big "D" bond in the amount of $700,000, due June 1, 1969, and held by Great Southwest was precisely the indebtedness of petitioner to Great Southwest reduced by the book entries reflecting payment of the Great Southwest bond. In the stipulation of facts the parties jointly agreed that: "The following payments of principal and interest by Great Southwest Life Insurance Company to Big "D" Development Corporation were made by entries on the books of Big "D" Development Corporation reducing the principal and/or interest of the general obligation bond due June 1, 1969, of Big "D" held by Great Southwest Life Insurance Company. * * *" The evidence for the existence of the Big "D" bond was an abstract from a proxy statement, dated November 30, 1964, published in connection with the "Proposed Merger of Great Southwest Life Insurance Company, Dallas, Texas and Texas *196 Reserve Life Insurance Company, Houston, Texas." The abstract was a joint exhibit attached to the stipulation which the parties lodged with the Court. Petitioner has made no effort to show by evidence the existence of any other general obligation bond of Big "D" held by Great Southwest, due June 1, 1969. The interrelatedness of the Big "D" bond with the sale of Block 4/975 is the heart of respondent's case. It is significant that petitioner, nonetheless, merely argues about the sufficiency of the evidence, and does not in fact deny that it was the Big "D" bond in the principal amount of $700,000, and due June 1, 1969, which was reduced 650 by offsetting amounts owed under the Great Southwest bond. The play upon the evidence attempted by petitioner's counsel, who must surely have more than some knowledge of petitioner's affairs, is inappropriate. The amount considered received in the year of a transaction by a taxpayer making an installment sale is computed by taking into account amounts constructively as well as actually received. Williams v. United States, supra; Stephen A. Cisler, Jr., 39 T.C. 458, 466 (1962); *197 J. L. McInerney, 29 B.T.A. 1, 6 (1933), affirmed 82 F. 2d 665 (C.A. 6, 1936). Any outstanding indebtedness of a seller to a purchaser cancelled in consideration for the transfer of property in an installment sale will be considered a payment received in the year of sale. Riss v. Commissioner, 368 F. 2d 965, 968 (C.A. 10, 1966), affirming a Memorandum Opinion of this Court; W.H. Batcheller, 19 B.T.A. 1050, 1053-1054 (1930). The transfer of appreciated property in satisfaction of an indebtedness is a sale or exchange resulting in recognizable gain to the extent the cancelled debt exceeds the taxpayer's basis in the transferred property. Harry L. Bialock, 35 T.C. 649, 660 (1961); Peninsula Properties Co., Ltd., 47 B.T.A. 84, 91 (1942). Thus we have concluded that petitioner, at the time of the sale, was in receipt of $591,175.55 since its indebtedness to Great Southwest could, at its sole discretion, be reduced by that amount. The present situation appears analogous to cases where taxpayers have set up elaborate *198 escrow schemes, Williams v. United States, supra; Rhodes v. United States, 243 F. Supp. 894 (W.D.S.C. 1965); Everett Pozzi, supra, or shell corporations; Hindes v. United States, supra, in an effort to establish a qualifying installment sale. In those cases the courts were able to see through the arrangements and observe that full receipt of the total consideration merely awaited the command of the seller, and that any cross indebtedness was lacking in reality. See also Newmark v. Commissioner, 311 F. 2d 913 (C.A. 2, 1962), affirming a Memorandum Opinion of this Court. There it was held that a taxpayer had received salary from his controlled corporation because demand notes issued in lieu of salary by the corporation could be offset against taxpayer's debt to the corporation. The interrelatedness of the Big "D" bond, the Great Southwest bond, and the conveyance of the Block 4/975 property is further emphasized by the fact that both bonds bore interest at the rate of 5 1/2 percent per year. Blue Flame Gas Co., supra. The process of reducing the Great Southwest indebtedness by a series of entries *199 on petitioner's books, decreasing its obligation to Great Southwest by equivalent amounts, will not serve to qualify the transaction in issue as an installment sale. The purpose for this method of payment is not clear from the record before us. We can only infer, as does respondent, that it was selected to accommodate petitioner's desire to qualify for installment reporting However, mere bookkeeping formalisms engaged in solely for the purpose of permitting a taxpayer to report gain on the installment basis will not be given effect. John H. Rickey, 54 T.C. 680, 694 (1970). Our decision here is not altered by the opinion in Estate of Lipman v. United States, 376 F. 2d 455 (C.A. 6, 1967), affirming 245 F. Supp. 393 (E.D. Tenn., 1965). There stock was purchased from the taxpayer-wife by a corporation which agreed, inter alia, to cancellation of the taxpayer-husband's indebtedness according to a set schedule in years subsequent to the year of sale. It was held that this provision did not constitute a payment in the year of sale. The Court of Appeals *200 noted that the taxpayer-husband had covenanted not to compete with the corporation, and that while a violation of the covenant would cause the taxpayer-husband's indebtedness to become immediately due, the corporation would nonetheless be liable to continue payments to the taxpayer-wife for the stock. The present case clearly lacks this particular tripartite aspect. An additional reason the Court of Appeals affirmed the District Court in Lipman was because bankruptcy of the purchaser would leave the taxpayer-husband liable to the purchaser's creditors. We do not have in evidence the terms of the Big "D" bond and cannot say that bankruptcy of Great Southwest would leave petitioner liable to Great Southwest's creditors. Lacking evidence, we are not at liberty to assume facts favorable to the petitioner on whose shoulders the burden of proof rests. 651 The present case has presented a close factual question. The record in some respects is incomplete. The extent to which this Court is left uninformed as to the details of the transaction must weigh against the petitioner on whom the burden of proof rests. Based upon the whole record and for the reasons set forth above, we decide *201 petitioner's gain on the sale of the Block 4/975 land in 1964 cannot be reported by the installment method but rather is fully taxable in its fiscal year ended October 31, 1964. Accordingly: Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. SEC. 453. INSTALLMENT METHOD. (a) Dealers in Personal Property. - (1) In general. - Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price. (b) Sales of Realty and Casual Sales of Personalty - (1) General rule. - Income from. - (A) a sale or other disposition of real property, or * * * may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a). (2) Limitation - Paragraph (1) shall apply - (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 * * * only if in the taxable year of the sale or other disposition - (i) there are no payments, or (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.↩